ALVIN I. MALNIK AND DEBORAH C. MALNIK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Malnik v. Commissioner
Docket No. 5307-76.
United States Tax Court
T.C. Memo 1985-467; 1985 Tax Ct. Memo LEXIS 169; 50 T.C.M. (CCH) 977; T.C.M. (RIA) 85467; September 4, 1985. Steven S. Brown and Royal Martin, for the petitioners. Thomas R. Ascher, for the respondent. DRENNEN
MEMORANDUM OPINION DRENNEN, Judge: By notice of deficiency dated March 15, 1976, respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Addition to Tax
Year
Deficiency
[1] § 6653(b) 1962
$323,254.66
$161,627.33
1963
625,279.29
312,639.65
The issues for decision are: (1) Whether petitioners understated the amount of their gross receipts on Schedule C of their income tax returns for the years 1962 and 1963; (2) Whether petitioners failed to report interest income for the year 1963; (3) Whether petitioners overstated business expenses and itemized deductions on their income tax returns for the years 1962 and 1963; (4) Whether petitioner Alvin I. Malnik is liable for the addition to tax for fraud under section 6653(b) for the years 1962 and 1963; and (5) Whether the assessment and collection of any taxes and additions to tax for the years 1962 and 1963 is barred by the statute of limitations. *171 GENERAL FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact and the exhibits attached thereto are incorporated herein by this reference. The primary issues herein concern petitioner Alvin I. Malnik's income from his practice of law and related business activities. Petitioner Deborah C. Malnik is a party to this proceeding solely on account of her signing joint income tax returns for the years 1962 and 1963. Respondent does not assert that Deborah is liable for the addition to tax for fraudulent understatement of income. Accordingly, throughout our findings of fact and opinion we use the singular "petitioner" to refer to Alvin I. Malnik. Petitioners resided in Miami, Florida at the time they filed their petition herein. Petitioners filed joint Federal income tax returns for the taxable years 1962 and 1963. Petitioners' 1962 return was filed on or about April 15, 1963. Their 1963 return was filed on or *172 about June 15, 1964. Petitioners reported their income on the cash receipts and disbursements method of accounting. The taxable income reported on their 1962 return was $9,102.68 and on their 1963 return was $42,520.49. Petitioner's Legal Practice
Petitioner received a B.A. degree from Washington University in St. Louis, Missouri, in 1954. In 1959, he graduated cum laude from the University of Miami Law School, and was admitted to the practice of law in the state of Florida. During law school, petitioner was engaged in the business of buying and selling second mortgages on residential property. Petitioner's father was also engaged in the second mortgage business. Petitioner worked part-time for an accountant during law school, but had no formal training in accounting. He took no tax courses in law school. Upon graduation from law school in 1959, petitioner commenced the practice of law in Miami, Florida, as a sole practitioner. He was 26 years old at the time. Petitioner did not specialize in any area of law. His practice during 1962 and 1963, however, was dominated by work for a group of financial and investment concerns based in Florida, California and *173 Nassau, Bahamas. The bulk of petitioner's practice consisted of work for various concerns controlled by an individual named Philip J. Matthew. Petitioner became acquainted with Matthew in 1960, and during the period from about mid 1961 through 1963 petitioner helped organize and/or served as counsel to various concerns controlled by Matthew. Matthew lived in California, and, due to the increasing amount of work he performed for Matthew, petitioner and his family moved to California in 1961 and lived there throughout most of 1962. Petitioner returned to Miami sometime during the latter part of 1962, at which time his relationship with Matthew had begun to deteriorate. Much of petitioner's work for Matthew was related to the Bank of World Commerce (BWC) and Allied Empire, Inc. (Allied). Matthew was the president and majority shareholder of both. Petitioner served as a director of both corporations. BWC was chartered in Nassau, and petitioner helped Matthew organize the concern. BWC was not a commercial bank, but could more accurately be described as an investment company. BWC apparently functioned as an umbrella corporation and a source of financing for various ventures of *174 Matthew. Individuals who desired to invest in any of Matthew's ventures were required to make deposits in BWC under one-year, no interest, deposit agreements. These deposits essentially were a premium paid to Matthew for the privilege of participating in his ventures, which apparently were viewed as highly attractive opportunities. Petitioner served as counsel to BWC, but, as more fully discussed below with respect to certain items in dispute, his relationship with Matthew deteriorated in 1963 when BWC suffered financial reverses. Allied was an investment company based in California. As discussed more fully below, petitioner performed legal services for Allied under an agreement with Matthew according to which petitioner received as compensation stock in Allied. In addition to his work for BWC and Allied, petitioner performed legal services for Matthew and other clients in connection with the establishment of savings and loan organizations. He also earned fees by arranging sales of stock for certain individuals. Some of the stock sales were related to his work for BWC and Allied. Preparation of Petitioners' Income Tax Returns
Petitioners' tax returns for the years *175 1962 and 1963 were prepared by an accountant by the name of Irwin Raskin. Raskin met petitioner in 1956, and prepared all of petitioners' tax returns from that time through the late 1960s. Petitioner worked part-time for Raskin while in law school. Petitioner did not employ a bookkeeper during 1962 or 1963, and did not himself maintain any formal books or records for his law practice. Petitioner commonly made notations on bank deposit slips and bank statements in order to identify the source and nature of deposits and disbursements. Petitioner maintained a number of checking accounts for both business and personal purposes. Petitioner's primary business checking accounts were maintained with the Mercantile Trust Company in Miami and the Ahmanson Bank & Trust Company in Los Angeles. At each of these banks, petitioner maintained a regular checking account for the general purposes of his law office, and a trust account into which were deposited items held in escrow for on behalf of clients. In addition to the accounts at Mercantile and Ahmanson, petitioner maintained other accounts at other banks, including Barclay's Bank of Nassau and the International Credit Bank of Geneva, *176 Switzerland. In preparing petitioners' 1962 return, Raskin first reviewed all of petitioner's bank statements, deposit slips, debit memos, checks, check stubs and charges against the accounts. Raskin concentrated mainly on the law office and trust accounts at the Mercantile and Ahmanson banks. Raskin consulted with petitioner when uncertain about the classification of an item. Either he or petitioner would check the files in order to determine how to treat such an item. Raskin then prepared summaries of each account on columnar-type sheets, which identified the various income items and debit items, the sources of income, and the purpose of expenditures. An integral aspect of Raskin's analysis of petitioner's financial records was his preparation of what he termed "T-accounts." [2] These were reconstructions, on columnar paper, of each of petitioner's escrow and trust accounts he maintained for clients and others. The T-accounts showed the item-by-item history of each account throughout the year. By reviewing the T-accounts and the analysis of the bank accounts, Raskin was able to identify the income and expense items for the preparation of the 1962 return. *177 Raskin prepared petitioners' 1963 return in a similar fashion. However, in preparing the 1963 return, he also prepared worksheets in double entry form for receipts and disbursements with respect to each bank account. He then prepared T-accounts, and used the worksheets and T-accounts to determine the income and expense items to be used in preparing the return. In preparing both the 1962 and 1963 returns, Raskin consulted with petitioner and reviewed petitioner's files in order to identify particular items. However, Raskin himself made determinations as to whether or not a given item should be taken into account in the return for a particular year. Criminal Investigation and Proceedings
In March 1964, the Internal Revenue Service commenced a criminal investigation of petitioner. During the course of the investigation, between March 1964 and March 1967, petitioner had at least ten telephone conversations with the IRS agent handling the investigation, and attended several question and answer sessions and at least seven meetings. Petitioner was accompanied by his attorney at some of the meetings. The investigation initially involved petitioners' returns for the years 1959 *178 through 1962. After petitioners' 1963 return was filed in June 1964 that return was also included in the investigation. During the course of the investigation, petitioner did not furnish the business records of his law practice to the IRS agents. [3]
In April 1969 petitioner was indicted by the United States Grand Jury for the Southern District of Florida for two counts of willfully and knowingly making and subscribing, under the penalties of perjury, joint Federal income tax returns for the taxable years 1962 and 1963 in violation of section 7206(1). A trial on these charges commenced on July 13, 1970 before the United States District Court for the Southern District of Florida. On July 23, 1970, the jury returned a verdict of not guilty as to Count I, relating to the taxable year 1962, but was unable to reach a verdict with respect to Count II, relating to the taxable year 1963. On August 3, 1970 a second trial commenced with respect to Count II. On August 6, the Court granted the defendant's (petitioner's) motion *179 for acquittal. Reconstruction of Accountant's Original Workpapers for 1962 and 1963 Returns
In late 1969 or early 1970, in connection with the criminal trial, Raskin reconstructed worksheets and T-accounts for the years 1962 and 1963. [4] Raskin produced these worksheets and T-accounts in the same fashion in which he produced the original documents used in preparing the returns. The reconstructions were based on Raskin's review of original business records such as bank statements, checks and check stubs, credit and debit memoranda, and invoices. Raskin did not use the tax returns in preparing the reconstructions. He spent several weeks preparing the reconstructions. The reconstructed worksheets and T-accounts Raskin prepared at the time of the criminal trial closely approximated, and in some cases compared exactly, with the figures reported on the 1962 and 1963 tax returns. Slight deviations occurred due to the fact that Raskin classified certain items differently in his reconstruction than in his preparation of the returns. In addition to the worksheets *180 and T-accounts, Raskin at the time of the criminal trial prepared a schedule of fee income reported by petitioner on his 1963 return. This schedule was based on the reconstructed worksheets. The figure for total fee income on the schedule was identical to the figure reported on Schedule C of the 1963 return. Raskin did not prepare such a schedule of fee income reported for the year 1962. During trial of the instant case, the reconstructed worksheets, T-accounts and schedule of fee income prepared by Raskin at the time of the criminal trial were received in evidence. Reproductions of various bank statements, bank account ledgers, checks, check stubs, credit and debit memoranda, brokerage account ledgers, and other documents relating to petitioner's legal practice and business ventures were stipulated by the parties. [5]
*181 Civil Investigation and Proceedings
Subsequent to the conclusion of the criminal proceedings in August 1970, the files in the possession of the Department of Justice were referred to the Internal Revenue Service. On January 11, 1971 a revenue agent by letter notified petitioner that his tax returns for the years 1959, 1960, 1962 and 1963 had been referred to him for civil settlement. On March 16, 1971, the IRS issued a summons to petitioner requiring him to give testimony and produce books and records for the investigation of his tax liability for the years 1959, 1960, 1962 and 1963. The summons directed petitioner to appear before an IRS agent on March 29. This date was later extended to May 4. Prior to May 4, 1971 an agreement was reached between counsel for the IRS and counsel for petitioner according to which, in lieu of the personal appearance by petitioner as required by the summons, petitioner's attorney would provide a written statement signed by petitioner stating that if petitioner appeared he would claim his constitutional privileges to all relevant and material questions propounded to him and to the production of such of the records in his possession. *182 On December 7, 1971 the IRS filed a petition to enforce the summons. The United States District Court for the Southern District of Florida issued an order requiring petitioner to show cause why he should not be compelled to testify and produce the records demanded in the summons. At a hearing on January 10, 1972, petitioner claimed that compliance with the summons would cause him to incriminate himself in violation of the Fifth Amendment to the Unitd States Constitution. On February 17, 1972, the court issued an order directing petitioner to comply with the summons. However, on March 3 the court granted petitioner's motion to stay and ordered a rehearing. At the rehearing on March 16, 1972, petitioner argued, without admitting, that it was possible that false statements and representations were made at hearings and conferences before the United States Treasury Department in connection with the criminal proceedings and that if he were to testify or produce records in compliance with the summons, such action could expose the hypothetical prior false statements and representations with the possible result of criminal prosecution of petitioner under section 7201 or other statutes. *183 [6] On April 10, 1972, the court reversed its prior order and issued an order dismissing the Government's petition to enforce the summons. United States v. Malnik,348 F. Supp. 1273 (S.D. Fla. 1972). The Government appealed the order of the district court to the United States Court of Appeals for the Fifth Circuit. In an opinion issued February 8, 1974, the appeals court affirmed the order of the district court, although on completely different grounds. The court held that the agreement between petitioner and the IRS whereby petitioner did not have to appear personally under the summons constituted a waiver of the Government's right to enforce the summons. United States v. Malnik,489 F.2d 682 (5th Cir.), cert. denied, 419 U.S. 682 (1974). On November 19, 1975, respondent issued a thirty day letter to petitioners which set forth the examination report of the revenue agent. Petitioners filed a protest on December 20. The protest was returned to petitioners *184 by letter dated January 7, 1976. No further protest was filed. On March 15, 1976, respondent issued the notice of deficiency herein. The notice of deficiency contained itemized adjustments to petitioner's gross receipts from business. These adjustments were grouped under three general categories: legal fee income, miscellaneous income, and unidentified bank deposits. Respondent's computations of petitioners' gross receipts, the amounts reported on petitioners' tax returns, and the amount of unreported business receipts as determined by respondent for the years 1962 and 1963 are summarized as follows: 1962
1963
Respondent's Computation of Gross Receipts
Legal Fee Income
$239,469
$142,723
Miscellaneous Income
160,817
605,346
Unidentified Bank Deposits
26,435
30,352
Total
426,721
778,421
Gross Receipts Reported on Return
49,332
80,979
Unreported Business Receipts
$377,389
$697,442
The notice of deficiency also increased petitioners' interest income for the years 1962 and 1963 in the amounts of $451 and $6,000, respectively; decreased petitioners' allowable business expenses for the years 1962 and 1963 in the amounts of $24,712 and $22,306, *185 respectively; decreased petitioner's itemized (nonbusiness) deductions for the years 1962 and 1963 in the amounts of $1,072 and $319, respectively; and determined that petitioners received additional income of $400 in 1963 from a door prize. The notice of deficiency also determined that petitioners are allowed a capital loss deduction of $1,000 for the year 1963, rather than a net capital gain of $8,317 as reported on their return. [7]
FINDINGS AND OPINION The statute of limitations has long since run on the assessment and collection of any deficiencies in tax and additions to tax for petitioners' tax years 1962 and 1963, section 6501(c), unless respondent can come forth with some provision in the law that would lift the bar of that statute. Petitioners' joint returns for both years were valid returns and were timely filed. [8] No extensions *186 were granted. Even the six year extended period for assessing tax under section 6501(e) where there has been a substantial omission of income expired some years before the notice of deficiency was issued. Therefore, respondent must rely, and does rely, on the exception provided in section 6501(c), which provides that in the case of a false or fraudulent return with the intent to evade tax or a willful attempt in any manner to defeat or evade tax, the tax may be assessed at anytime. Since a conclusion for petitioner on the issue of the statute of limitations would require us to enter a decision for petitioners, we will address that issue first. In any proceeding involving the issue whether a taxpayer has been guilty of fraud with intent to evade tax, the burden of proof with respect to fraud is on the Commissioner. Section 7454(a), I.R.C.; Rule 142, Tax Court Rules of Practice and Procedure. Thus, respondent has the burden of proving by clear and convincing evidence that some part of an underpayment of tax was *187 due to fraud with the intent to evade tax. Rule 142(b), Tax Court Rules of Practice and Procedure. Fraud thus encompasses two elements: (1) an underpayment, (2) some part of which is due to fraud. Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court. Respondent must present clear and convincing evidence of each element of fraud. Hebrank v. Commissioner,81 T.C. 640, 642 (1983); Stratton v. Commissioner,54 T.C. 255, 284 (1970). Because the existence of an underpayment is an element of fraud as to which respondent bears the burden of proof, respondent may not rely on the presumption of correctness which generally attaches to determinations contained in the statutory notice of deficiency. Affirmative proof of an underpayment is required. The Commissioner cannot discharge his burden of proof by simply relying on the taxpayer's failure to prove error in the determination of the deficiencies. Drieborg v. Commissioner,225 F.2d 216, 218 (6th Cir. 1955), affg. in part, revg. *188 and remanding in part a Memorandum Opinion of this Court; Shaw v. Commissioner,27 T.C. 561, 570 (1956), affd. 252 F.2d 681 (6th Cir. 1958). [9] However, once the Commissioner meets his burden of showing an underpayment due to fraud, thereby removing the bar of the statute of limitations, the burden of proof is on the taxpayer to prove that the determinations in the notice of deficiency are erroneous. Bryan v. Commissioner,209 F.2d 822 (5th Cir. 1954); Shaw v. Commissioner,27 T.C. at 570. [10]
If respondent is successful in proving the existence of an underpayment, [11] he must then show that some part of that underpayment is due to fraud. Fraud in this context has been defined as an intentional wrongdoing with the specific purpose to evade a tax believed to be owing. Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941), *189 revg. and remanding 40 B.T.A. 424 (1939); Estate of Temple v. Commissioner,67 T.C. 143, 159 (1976). Fraud is never presumed, but must be established by affirmative evidence. Beaver v. Commissioner,55 T.C. 85 (1970). However, because direct proof of fraud is rarely available, respondent may prove fraud by circumstantial evidence. The taxpayer's entire course of conduct may establish fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. at 105-106. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion, 578 F.2d 1383 (8th Cir. 1978). In summary, respondent must present independent, affirmative evidence of a clear and convincing nature that petitioner underpaid his tax in some amount with the intent to evade tax, in order to lift the statute of limitations for the years in *190 issue. [12]
Based on the record in its entirety, we cannot find that respondent has convincingly demonstrated by affirmative evidence that petitioner underpaid his tax for either 1962 or 1963 and that any such underpayment was coupled with an intent to evade tax. This conclusion makes it unnecessary for us to discuss in detail the various transactions and activities of petitioner upon which respondent relies to prove unreported income and fraudulent intent. However, we will discuss some of them in rather broad categories to illustrate why we conclude that respondent has not carried his burden of proof. Unfortunately, the transactions here involved and petitioner's course of conduct related thereto took place 20 years before the trial of this case began. The delay resulted from the prosecution of petitioner for criminal tax fraud twice, the extended discovery *191 procedures instituted by respondent in connection with the civil investigation, and the time it took to prepare the case for trial after the petition was filed. Consequently, the evidence offered at this trial was often conjectural or based on recollections blurred by time. Petitioner apparently became involved rather soon after he began practicing law in rather complex financial transactions stretching from Miami to Los Angeles and The Bahamas. Being a lone practitioner he did not keep detailed records of his income and expenses and it has been very difficult for both petitioner and respondent, to say nothing of the Court, to resolve the tax implications of petitioners' transactions. Respondent has put his own interpretation on the numerous transactions he has uncovered, mostly from third party records. Petitioner has explained, mostly by oral testimony but also by comparisons of his own and third party records, almost all of the transactions involved in such a manner that, if true, would result in very little unreported taxable income received by him. Respondent has presented very little evidence to contradict petitioner's explanations, which may be understandable but not *192 helpful in carrying his burden of proof on the fraud issue. The evidence is so uncertain in many respects that we would find it difficult to make specific affirmative findings of fact with regard to many of the transactions, and find no reason to do so. The bulk of the adjustments to petitioners' taxable income in the notice of deficiency involve additional gross receipts determined to have been received from petitioner's law practice and related transactions. Respondent offered no evidence that petitioner engaged in any nefarious or illegal businesses which produced under-the-table profits; nor that petitioner deliberately attempted to conceal any of the transactions. The adjustments to gross receipts were grouped into three general categories: legal fee income, miscellaneous income, and unidentified bank deposits, in the amounts related above. The notice of deficiency also made other adjustments to petitioners' income which are of minor importance both in terms of the amounts involved and the issue of fraud. The criteria governing the classification of the individual items between legal fees and miscellaneous income is not clear. This is due to the unusual nature of petitioner's *193 law practice. What we have been able to glean from the record indicates that petitioner spent a substantial amount of time performing non-legal work such as arranging loans for and selling stock on behalf of his clients. The major items in dispute involve alleged unreported income from such activities. During the stipulation process and preparing for trial respondent has conceded a good many of the transactions in issue, perhaps because for the first time he has been given petitioners' explanations and evidence of those transactions. There is little doubt in our mind that prior to the actual preparation for trial of this case petitioner has not cooperated with respondent in his investigation and audit of petitioners' tax liability for the years 1959 through 1963, and that he might have saved both the Government and himself time, effort and expense had he done so. However, in weighing this factor we keep in mind that from its inception the Government's investigation was directed toward criminal tax evasion. Petitioner was aware of this, knew the implications thereof and, upon advice of counsel, reacted in a manner that he thought was for his own best interests and within his *194 rights. See United States v. Malnik,489 F.2d 682 (5th Cir. 1974), affg. on different grounds United States v. Malnik,348 F. Supp. 1273 (S.D.Fla. 1972). [13]
We turn now to a brief discussion of, and an examination of the evidence with respect to the more important transactions which respondent relies on to prove the deficiencies and the fraud. I. ALLEGED UNDERSTATEMENTS OF GROSS RECEIPTS FOR 1962
A. Legal Fee Income
1. Bank of World Commerce. Respondent determined that petitioner received unreported legal fees in the amount of $23,163.37 ($8,163.35 and $15,000.02) in 1962 from Bank of World Commerce (BWC). Petitioner testified that he received and reported on his return $15,448.72 of legal fee income from BWC. Respondent offered no direct evidence that the $15,448.72 was not included in the legal fee income reported on petitioners' return. BWC, an investment company, chartered in The Bahamas, was formed by Philip Matthew and Associates in order to finance business ventures. Petitioner assisted Matthew in its formation and was to receive *195 a retainer fee of $20,000 per year for his services to BWC. Investors in business ventures initiated or controlled by Matthew were required to deposit sums of money in BWC for one year free of interest. These sums were used by Matthew in new ventures. Petitioner received $8,163.35 during the first quarter of 1962, which included three checks (one per month) in the amount of $1,666.66, and three additional checks in the amounts of $611.72, $2,070.00 and $481.65. Between April 26 and December 21, 1962 petitioner received checks totaling $24,763.09 from BWC which were deposited in his account at Barclay's Bank in Nassau, Bahamas. Included in this amount was a check for $4,200 which represented the proceeds from a sale of stock. The balance of the deposits represented legal fee income from BWC. Petitioner maintained a fee splitting arrangement with Gerry Capps, an attorney in Nassau who also represented BWC. On December 26, 1962 petitioner sent a check in the amount of $15,000 to Capps' law firm, which bore a notation "settlement of 1962 legal fees." Capps endorsed and deposited the check. Respondent's determination that petitioner received legal fee income from BWC in the amount *196 of $23,163.35 was based on the $8,163.35 received by petitioner from BWC during the first quarter of 1962 plus $15,000 which respondent assumed had been paid under the retainer fee arrangement (9 months X $1.666.67). Both petitioner and Capps testified about the fee splitting arrangement and that $11,000 of the $15,000 paid to Capps in December was paid under this arrangement. The evidence also supports petitioners' contention that $4,200 of the amounts received by petitioner from BWC was from the sale of stock. Petitioner testified that the $611.72 check received from BWC was reimbursement for expenses which he netted out for tax reporting purposes, neither reporting the reimbursement as income nor deducting the expenses he incurred and paid. [14] If we subtract the total of the above three figures from $32,926.44 total petitioner received from BWC in 1962, the balance is $17,714.72, just $1,666.00 more than petitioner claims he reported on his 1962 return from this source. Petitioner admits that he failed to report one monthly payment of $1,666.00 he received under the retainer fee arrangement. Thus it would appear that petitioner underreported his taxable legal fee income from *197 BWC in the amount of $2,277.72 ($1,666.00 plus $611.72 reimbursement). While petitioner and his accountant may have been negligent with respect to these two items, there is nothing to suggest that the items were omitted with intent to evade tax. 2. Robert Winthrop & Co. and Philip J. Matthew. Respondent determined that petitioner received legal fee income in the amount of $33,200 from Robert Winthrop & Co. and $2,206.11 from Philip J. Matthew in 1962. Respondent has conceded that $25,700 of the amount received from Winthrop represents finders fees which petitioner reported on his 1962 return. The remaining $7,500 relates to amounts received from or on behalf of Matthew in connection with investments made by Matthew with petitioner's assistance. Matthew and Singer invested in an *198 equipment leasing venture promoted by Winthrop and were represented by petitioner in that regard. In August 1962 petitioner received from Winthrop $7,500 which represented a refund due to Matthew and Singer from the leasing venture. Petitioner deposited the $7,500 into an escrow account [15] and did not disburse the funds at that time because the leasing transaction had not been completed and because he was uncertain how the funds should be allocated between Matthew and Singer. In July 1962 petitioner received $2,000 from Matthew to be used on Matthew's behalf in connection with a separate investment. Also in July 1962 petitioner disbursed $2,800 on behalf of Matthew in connection with the organization of a corporation known as Merritt Financial Corp. In January 1973 petitioner paid Singer $2,000 for his share of the refund from Winthrop. This left $4,700 in escrow. In 1963 a dispute arose between petitioner and Matthew which related primarily to Matthew's abandonment of several business ventures and petitioner's subsequent efforts to wind up those *199 affairs and ensure that investors in BWC and others of Matthew's ventures were repaid to the extent possible. Petitioner incurred substantial expenses in that regard and the dispute involved the amount of fees and reimbursements due petitioner for such work.As a result Matthew employed a different attorney, Hettleman. Petitioner and Hettleman reached a settlement in February 1964 whereby petitioner was entitled to retain the $4,700, which he reported as income on his 1964 return. Respondent contends that petitioner's explanation of these events is not credible and that "there is no evidence to support the petitioner's position that he properly accounted for the aforementioned funds." We disagree. We find ample evidence in the record to corroborate petitioner's explanation and, in fact, respondent does not dispute most elements of petitioner's account. With respect to the $2,800 payment on behalf of Matthew in connection with the Merritt Financial Corp., respondent contends that "there is no way of knowing for certain whether Matthew reimbursed Malnik for the funds he expended." Respondent forgets wherein lies the burden of proof. Furthermore, Matthew testified in both the criminal *200 trial and this proceeding and gave no indication that he reimbursed petitioner for this payment. Hettleman also testified in the criminal trial and corroborated petitioner's account with respect to the $4,700 retained in the escrow account. $2,000 of the check received by petitioner from Philip J. Matthew was for an investment in the San Remos Island Club and the remaining $206.11 of this adjustment was for reimbursement of expenses. We find that petitioner did not underreport his income from these transactions on his 1962 return except possibly the reimbursements. 3. Allied Empire, Inc. Respondent determined in the notice of deficiency that petitioner received $3,477.61 from Allied Empire, Inc. in connection with the performance of legal services, which he failed to report. Respondent now concedes that $3,000 of that amount was reported on petitioners' return as legal fee income. The remaining $477.61 was for reimbursement of expenses. The largest adjustment made by respondent in petitioner's legal fee income for 1962, and the most bothersome, is his determination that petitioner received 5,000 shares of Allied Empire stock having a value of $150,000 in 1962 as legal *201 fees which he failed to report. Petitioner contends that the stock delivered to him in 1962 is not reportable as income in that year but rather in 1961, the year he claims it was constructively received. Petitioner also contends that if the value of the stock is properly reportable as income in 1962, the fair market value of the stock was $5,000 and that amount was reported on his 1962 income tax return. Sometime in 1961 Philip Matthew acquired a controlling interest in and became chairman and chief executive officer of Allied Empire, Inc. (Allied), a financial holding company based in California.Petitioner performed legal services for Matthew in connection with his acquisition of Allied. Sometime in 1961 petitioner and Matthew agreed that if petitioner would move to California and continue to work for Matthew, petitioner would receive 5,000 shares of Allied stock. On April 3, 1962 Allied delivered to petitioner 2,500 shares of its stock. On August 30, 1962 Allied delivered to petitioner an additional 2,500 shares of its stock. The 2,500 shares petitioner received from Allied on April 3, 1962 were not subject to any restrictions on their sale. The 2,500 shares petitioner received *202 from Allied on August 30, 1962 were subject to a restriction on their sale. In March of 1963 petitioner exchanged this certificate for an unrestricted certificate representing 2,500 shares of Allied. On his income tax return for 1963 petitioner reported the sale of 5,200 shares of Allied stock, acquired on April 3 and September 1, 1962, and sold on March 20 and July 30, 1963. The basis of the shares was stated to be $9,125, and the sale price $41,703, yielding a long term capital gain of $32,578. Allied stock was publicly traded on the over-the-counter market. In 1961 at the time Matthew agreed to issue 5,000 shares of Allied to petitioner, the stock traded for about $1 per share. The value of the stock increased dramatically during the latter half of 1961; it traded as high as $70 per share in late 1961 or early 1962.Conversely, the market quotations for the stock decreased rapidly during the remainder of 1962, the bid prices dropping from $41 per share on February 28, 1962 to $14 per share on September 28, 1962. On August 31, 1962 the bid price for Allied shares was $20 and the offering price was $23. In the notice of deficiency respondent determined that petitioner received *203 5,000 shares of Allied stock in 1962 for legal services to Matthew. He also determined that the fair market value of the shares received on April 3 was $40 per share and the fair market value of the shares received on August 30 was $20 per share, having a total value of $150,000. We cannot accept petitioner's argument that the Allied stock was constructively received in 1961. Section 1.451-2(a), Income Tax Regs., articulates the "constructive receipt" concept for a cash basis taxpayer as follows: Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time * * *. There is no evidence that the Allied shares were credited to petitioner's account, set apart for him, or otherwise made available to him prior to his receipt of the stock certificates in April and August of 1962. At the most petitioner received a contractural right to receive the stock at some unspecified future *204 date, provided he fulfilled his obligation to continue to perform legal services for Matthew. Such a mere contractural right to receive compensation falls short of establishing constructive receipt of property. Schniers v. Commissioner,69 T.C. 511 (1977); Amend v. Commissioner,13 T.C. 178 (1949). [16] We conclude that the value of the stock was taxable to petitioner in 1962 when he received it. The parties appear to be in agreement that 2,500 shares of the stock was received by petitioner on April 3 and a like amount on August 30, 1962. There does seem to be some difference of opinion as to the value of the stock on those dates. Respondent offered evidence that the stock was selling on the over-the-counter market at $40 per share on April 3 and at $20 per share on August 30, 1962. This does not take into consideration the the fact that the 2,500 shares received on August 30, 1962 were restricted. Petitioner reported the sale of 5,200 shares of Allied stock in March and July, 1963 on his 1963 return. The acquisition dates of this stock were stated to be April *205 3 and September 1, 1962. The basis of the shares was reported to be $9,125, and the sale price $41,703, yielding a long term capital gain of $32,578. [17]
We find respondent's evidence of the fair market value of the Allied stock on the two critical dates in 1962 to be far more convincing than petitioner's indirect evidence, so it would appear that petitioner underreported his legal income from this source by a large amount in 1962. It can be argued that this is convincing evidence of a fraudulent intent. But when all the circumstances are considered we do not find it to be clear and convincing. Under petitioner's agreement with Matthew the 5,000 shares of Allied stock were to be issued to petitioner as a legal fee for services to be rendered in 1961 and thereafter. The value of the stock at that time was $1 per *206 share or $5,000. We do not think it unreasonable for petitioner to think that he was paid a fee of $5,000 for the legal service he was rendering. This is particularly true when the evidence indicates that the quoted price on the exchange went up and down from $1 to $70 per share during the period between petitioner's agreement with Matthew and the time petitioner sold $5,200 shares in 1963 for an average price of about $8 per share. And of course the low basis claimed by petitioner on the sale of the stock in 1963 resulted in a capital gain rather than a quite large capital loss for tax purposes. The receipt of stock of uncertain value as a legal fee is somewhat unusual and we rather doubt that petitioner gave much thought to reporting it as income for 1962 [18]. 4. Additional Legal Income. In the notice of deficiency respondent determined that petitioner received legal income in 1962 from other sources in connection with additional *207 transactions. While we agree with respondent that some of the receipts were not properly reported for income tax purposes we do not believe any of them are indicative of fraud. We mention them only briefly. Petitioner received $397.20 from the law firm of Smathers & Thompson as a reimbursement of expenses incurred by petitioner on behalf of a client of Smathers & Thompson. Petitioner erroneously failed to report the payment as income but neither did he claim the expense as a deduction. Petitioner assisted in the sale of stock of the Waikiki Savings & Loan Association on behalf of various individuals including Matthew and A. W. Barlow. On December 17, 1962 he received $77,825.64 in proceeds from the sale of the stocks and deposited that amount into escrow. In late December 1962 and January 1963, petitioner disbursed the proceeds of the sale to various stockholders, retaining a portion of the funds in escrow to cover expenses and legal fees related to the sale. The dispute herein concerns the disposition of the funds retained in escrow. On brief respondent agrees that petitioner reported on his 1963 return $2,509 of this amount representing his expenses and legal fees in connection *208 with the sale. Without going into detail we find from the evidence that petitioner properly accounted for the remainder of the fund to Ernst & Ernst including a payment of $1,500 to A. W. Barlow. Petitioner received $6,200 on December 14, 1962 as a fee for legal services in establishing a branch office of a savings and loan institution. He was paid $3,100 by both Lynch and Alexander with the understanding that in the event the approval of the branch was withdrawn or revoked on or before October 1, 1963, petitioner was required to refund the entire $6,200. Petitioner reported the $6,200 on his 1963 return. Respondent determined that the $6,200 was income to petitioner in 1962. We agree with respondent that the fee is taxable to petitioner in the year of receipt despite the possibility that events could occur in a later year that would require the return of the money, United States v. Lewis,340 U.S. 590 (1951); but we find no intent to evade tax on petitioner's part in reporting the amount as he did. Petitioner received $3,000 in 1962 as reimbursement of expenses he incurred in behalf of Grand Island Indemnity which he did not report on his 1962 return because *209 it offset the expenditure he had made on behalf of Grand Island. Although we find that petitioner did in fact incur the expenses which he did not claim, we agree that he did not report the transaction properly. In 1962 petitioner received a payment from the law firm of Belli, Ashe & Gerry for legal services he rendered to the firm. The payment included $500 which was intended to reimburse petitioner for a trip to New York in connection with his work for the firm. Petitioner reported the bulk of the fee on his 1962 return, but reported the $500 travel reimbursement on his return for 1963. The $500 should have been reported on petitioners' 1962 return. B. Miscellaneous Income - 1962
Trade Bank & Trust Co - $106,581.25. In the fall of 1962 BWC was in need of cash to pay off deposit agreements that were coming due. [19] To provide this cash, Allied Empire, Inc., agreed to repay BWC some of the money it had borrowed from BWC in 1961 and 1962. Sidney Levy, a business associate of Matthew, agreed to obtain a loan on behalf of Allied from Trade Bank & Trust Company of New York (Trade Bank). Levy had funds on deposit in BWC which were coming due. *210 On October 15, 1962 Levy, on behalf of Allied and with the assistance of petitioner, obtained a loan from Trade Bank in the amount of $150,000. The net proceeds of the loan, $149,081.25, were deposited to Levy's account. Levy deducted from the loan proceeds the sum of $42,500, the amount which he had on deposit with BWC. Levy issued a check for the balance of the loan proceeds, $106,581.25, to Trade Bank. Trade Bank then issued a cashier's check payable to petitioner in the amount of $106.581.25. Petitioner, in his capacity as attorney for BWC, was partly responsible for seeing that the loan proceeds were credited to BWC and used to pay off the investors whose deposits had become repayable. Upon discovering that the Trade Bank cashier's check had been issued in his name, petitioner flew to New York to straighten out the matter. Petitioner endorsed the cashier's check at Trade Bank which then issued a check in the identical amount payable to Barclay's Bank, New York. Barclay's Bank D.C.O., Nassau, was the depository bank for BWC. Upon notification that Barclay's New York, had received the $106,581.25 check from Trade Bank, Barclay's Nassau issued pursuant to instructions *211 from Gerald Capps, an officer of BWC, bank drafts or cashier's checks to investors in BWC as follows: Investor
Amount
Gilbert Bronstein
$20,000
Helen Yensen
30,000
Aaron Magidon
30,000
John Pullman
25,000
Total disbursements
105,000
Retained by Levy
42,500
Total loan proceeds
[20] received by BWC investors $147,500
Respondent determined that petitioner received income from this transaction in the amount of $106,581.25 in 1962, primarily because petitioner endorsed the original cashier's check issued by Trade Bank. The documentary evidence and the testimony of Capps regarding this transaction is consistent and credible and clearly supports petitioner's version of the transaction. Respondent dismisses petitioner's explanation of the transaction as "implausible" but has not presented any evidence which conflicts with it. We conclude that the evidence presented does not support respondent's determination either with respect *212 to unreported income or fraud. C. Unidentified Bank Deposits
Respondent determined that petitioner received income in 1962 in the amount of $26,434.90 from various bank deposits which respondent contends have not been adequately identified by petitioner as non-taxable items. At trial, petitioner testified about most of the deposits in question, and identified these items as transfers of funds between accounts, repayments of loans, amounts received on behalf of others, and other non-taxable receipts. Petitioner's recollection of these items was refreshed by reference to documentary evidence such as cash receipts, worksheets, and T-accounts, which had been prepared by his accountant, Raskin, for purposes of the criminal trials, and by copies of bank account ledgers and deposit slips. Some of the account ledgers and deposit slips contain notations by petitioner identifying the nature of the deposits. Respondent contends that the documentary evidence relied upon by petitioner to corroborate his testimony and establish the non-taxable nature of the deposits in question does not represent credible and competent evidence, and that the cash receipts worksheets and the T-accounts *213 prepared by Raskin are unreliable and cannot substitute for original source records of these transactions. While there may be some justification for respondent's frustration concerning the unavailability of original source records, we nevertheless must take the record as it exists and make a determination based on the evidence before us, using our best judgment in evaluating the credibility and probative value of such evidence. Petitioner testified about each item, and his identifications of these deposits are substantiated in most cases in the cash receipts worksheets or T-accounts, and in some cases by copies of bank account ledgers and deposit slips. Many of the deposits in issue were fairly sizable in amount, ranging from $500 to $20,000, which petitioner would be more likely to remember, even though the deposits were made many years before. The largest deposit was of $20,000 which petitioner testified was a part of the proceeds of a loan in a larger amount from John Pullman who was a client of his and who was also president of BWC in 1962. Petitioner's testimony with respect to this item was rather meager in this trial but was more detailed in his testimony at the criminal *214 trial (the transcript of which was stipulated as an exhibit in this proceeding). Petitioner apparently borrowed $60,000 from the Ahmanson Bank on behalf of himself and BWC in 1962, signing a note therefore and using EWA stock, which had been made available to him by either Matthew or Pullman, as collateral. When BWC failed to make payments on its share of the loan, petitioner arranged to sell the EWA stock he held as collateral, which caused the entire principal of the Ahmanson Bank loan to become due. Pullman apparently loaned, or had BWC loan, petitioner $20,000 to pay his share of the loan to Ahmanson. When the EWA stock was sold petitioner used all the funds he had received in this transaction, except $4,500, to pay creditors of BWC. He withheld the $4,500 in escrow until he was certain that all claims were paid and then submitted the balance to BWC. Petitioner's testimony on this transaction is somewhat vague but there is no evidence to rebut it or suggest that any part of the funds involved therein represented taxable income to petitioner, except $500 which he reported as legal income in 1963. II.ALLEGED UNDERSTATEMENTS OF GROSS RECEIPTS FOR 1963
Respondent's determinations *215 of unreported income of petitioner for the year 1963 were also divided into three categories; legal fees, miscellaneous, and unidentified bank deposits, with little explanation of why the transactions are so categorized. Nevertheless, we will discuss some of these transactions under the categories into which they have been placed by respondent. Apparently because of petitioner's refusal to discuss these transactions with respondent's agents and his refusal to give them access to his books and records, respondent has determined that in numerous transactions in which petitioner received cash or securities as agent for his clients the amount of the cash or the value of the securities received constituted taxable income to petitioner. By his oral testimony and the testimony of the other parties involved and by reference to bank statements and other records petitioner has been able to explain to our satisfaction why most of the items charged to him in the notice of deficiency did not constitute taxable income to him. Since we have no evidence to rebut petitioner's claims, except the fact that the cash or security passed through petitioner's hands, we are inclined to accept petitioner's *216 explanations which are reasonable. If this is done, most of the unreported income is eliminated, and respondent is left with very little evidence of fraud. We discuss only a few of the larger and more obvious items charged to petitioner. Many of them follow a pattern of petitioner's business transactions and we have neither the space nor purpose to discuss all of them here. A. Legal Fee Income - 1963
1. Respondent contends that petitioner received income in the amount of $9,754.52 in connection with the sale of L. F. Popell stocks on behalf of Jay Weiss. Petitioner claims that the stock belonged to Weiss and he sold it in behalf of Weiss, depositing the proceeds in an escrow account for Weiss which he later distributed to Weiss. Weiss testified that petitioner fully accounted for all the proceeds from the sale of the stock to him, and also that Weiss paid petitioner no fee or commission for selling the stock, because Weiss, who was a good friend of petitioner, often referred other business to petitioner. A check voucher for $10,607 petitioner paid to Weiss in 1965 to close out the escrow account and a reconstruction of the escrow account prepared by petitioner's accountant *217 supports petitioner's claim. 2. In 1961 petitioner set up a trust for Grand Island Indemnity Co. with the First National Bank of Nevada.Grand Island was managed at that time by Morton Schorr. Petitioner performed legal services for Grand Island in connection with the trust during 1962 and 1963. On August 23, 1963 petitioner received a money order from Schorr in the amount of $3,475, which respondent charged to petitioner as income. Petitioner remitted $2,500 of the proceeds of the money order to Grand Island, as a payment of bank fees related to the trust. Documentary evidence and the testimony of Schorr and a bank officer during the criminal trial verify this payment. Petitioner retained the remaining $975 as his fee, which he reported on his 1963 return. 3. Petitioner received a check in the amount of $1,000 from Stein and Davis on November 19, 1963. This was to be part of a fee for petitioner's work on behalf of Security Underwriters, which was controlled by Stein and Davis. Securities Underwriters planned to acquire control of a bank in Miami. The $1,000 was credited to an escrow account designated Stein-Davis. Later Stein and Davis decided not to pursue the venture *218 and petitioner never performed any legal services related to the venture.Petitioner closed out the escrow account on March 15, 1964 and reported the $1,000 as income on his return for 1964. Respondent charged the $1,000 to petitioner as income for 1963. Respondent might be correct in determining that the $1,000 was income to petitioner in 1963 but petitioner's actions do not indicate a fraudulent intent. 4. In 1963 petitioner and Capps, an attorney associated with a Bahamian law firm, agreed to jointly represent Bucon Construction Co., in connection with Bucon's establishment in the Bahamas of savings and loan organizations. It was agreed that because Capps' firm incurred the initial organizational expense, Capps would be entitled to the first portion of the fees received from Bucon. On December 5, 1963 petitioner received from Bucon a check in the amount of $10,000. On December 7, 1963 petitioner issued a $10,000 check payable to Capps for his share of the fee. The check was offered in evidence and Capps verified that it was payment of a share of the fee. Respondent charged the $10,000 as income to petitioner in 1963 but offered no evidence to contradict petitioner's explanation. *219 5. Respondent now contends that petitioner received $25,000 [21] in 1963 as income from the sale of EWA Plantation stock on behalf of BWC. Petitioner contends that he received as income $500 from this transaction, which he reported. Sometime in the fall of 1962, it became clear that various enterprises controlled by Philip J. Matthew were experiencing severe financial difficulties and were in jeopardy. BWC was one of these enterprises and the depositors were demanding the return of their funds pursuant to one-year deposit agreements. In October 1962, petitioner, at the request of Matthew, borrowed $60,000 from Ahmanson Bank in his own name, and on his own note, to provide funds for BWC. The loan was collateralized with 4,000 shares of EWA Plantation stock owned by Matthew. Petitioner remitted $40,000 of the loan proceeds to BWC and retained $20,000 for his own use, as intended. When BWC was unable to make payments on the loan, petitioner arranged for the sale of 7,810 shares of EWA owned by Matthew or BWC, including the 4,000 shares collateralizing the loan. The stock was sold for $30 per share. The $120,000 *220 proceeds from the 4,000 shares was disbursed as follows: Repayment of loan to Ahmanson
$60,000.00
Unpaid interest
1,360.00
Paid to BWC
57,998.28
Transfer tax
141.72
$119,500.00
Retained by petitioner as fee
500.00
$120,000.00
The $114,300 proceeds from the sale of the remaining 3,810 shares was disbursed by petitioner as follows: Paid to John Pullman (pres. of BWC)
3,000.00
Paid to BWC
101,800.00
Paid to Major Riddle (settlement
claim against BWC)
5,000.00
$109,800.00
Balance retained by petitioner
as of 3-25-63
4,500.00
$114,300.00
As a result of the above petitioner personally owed BWC $20,000 for his share of the Ahmanson loan which had been paid. Since the required sale of the collateral had accelerated the due date of the loan, Pullman told petitioner he did not have to pay the $20,000 immediately. Matthew had departed for Israel in the spring of 1963, and petitioner became a representative of the investors in BWC who were seeking a return of their deposits. Hettleman became Matthew's attorney. Petitioner retained the $4,500 of BWC funds to settle claims of investors. On December 3, 1963, petitioner paid BWC *221 $24,500 by check drawn on his account at the International Credit Bank of Geneva, Switzerland. Pullman was living there at the time. The check covered the $20,000 petitioner owed BWC from the loan and the $4,500 he had withheld from the proceeds of the sale of the stock. The above scenario of this transaction is supported not only by petitioner's testimony, but by Hettleman's testimony in the criminal trial and Capps' testimony in this proceeding, and documentary evidence of the $24,500 check and the records of petitioner's account in the Geneva Bank. Respondent relies primarily on a statement given by petitioner to the Justice Department wherein he stated that the check was drawn to Matthew instead of BWC. Since Matthew owned and controlled BWC it is understandable that petitioner may have misstated the name of the payee. In any event the check itself supports petitioner's position here. Petitioner received only $500 from this transaction. B. Miscellaneous Income - 1963
1. Union Bank in Los Angeles. Respondent contends that petitioner has not accounted for the proceeds of a check in the amount of $350,549.41 [22] from Union Bank in Los Angeles payable to BWC but *222 received by petitioner. In March 1963, Allied Empire, Inc. was indebted to BWC and BWC needed the money. In order to pay BWC, Allied Empire obtained a loan from the Union Bank where an escrow account was established to account for the funds. Pursuant to escrow instructions from Allied Empire, on March 28, 1963, Union Bank paid out of the escrow account $600,000. Included was a check in the amount of $350,549.41 payable to BWC. Petitioner, Gerald Capps and John Pullman went to California to receive the check, and petitioner signed a receipt for the check. Capps and Pullman then took the check to Nassau where it was deposited into the account of BWC. The proceeds were distributed to various investors in BWC. Respondent relies on the fact that petitioner signed a receipt for the check, and on a letter from Matthew to petitioner dated September, 1964 in which Matthew requested that petitioner account for certain items. This letter, however, acknowledges that Capps and Pullman as well as petitioner received the check. Respondent also ignores other evidence that supports petitioner's *223 testimony. Capps' testimony fully corroborates petitioner's account of these events. And a copy of the check containing Capps' endorsement for deposit to the account of BWC was received in evidence. We think the evidence clearly supports petitioner's position. 2. BWC/EWA Stock - $197,808.80. In 1962 and early 1963 Matthew made an abortive attempt to acquire control of EWA Plantations, a Hawaiian corporation. He and various associates, who expected to profit extensively if Matthew gained control, bought numerous shares of stock in EWA, mostly in private sales. When it became apparent that Matthew's effort to gain control of EWA failed, petitioner during 1963 sold large blocks of EWA stock on behalf of various shareholders who sought to liquidate their holdings. Respondent contends that petitioner received income in the amount of $197,808.80 from the sale of 8,630 shares of this stock in 1963. [23]
The 8,630 shares appear to have been sold in three separate transactions. We have already discussed the sale of the *224 4,000 shares that belonged to either Matthew or BCW which were used as collateral for the Ahmanson loan. We have also discussed the sale of the 380 shares that belonged to John Pullman for $12,920. The remaining 4,250 shares that were sold by petitioner were owned by Edward Levenson and Irving Devine. The evidence shows, and respondent does not dispute, that petitioner paid $10,000 and $7,500 to Devine and Levenson, respectively, and paid the balance of $40,000 to BWC and $87,000 to the Canadian Imperial Bank of Commerce. Respondent contends, without any evidence to support him, that this $127,000 somehow innured to petitioner's benefit.There is no evidence that petitioner maintained an account in a bank in Canada or that he controlled the funds of BWC.We think it is unlikely that Levenson and Devine, having received a part of the proceeds from the sale of their stock, would have permitted petitioner to divert the much larger balance of the proceeds to his benefit rather than to theirs. 3. Matthew-Singer - $9,192.51. Respondent determined that petitioner received income in the amount of $9,192.51 in a transaction involving Matthew and Michael Singer. Matthew and Singer *225 had business dealings with one another during 1962 and 1963 and petitioner maintained escrow accounts for both of them. Singer also became indebted to BWC in the amount of $10,000. In settling up the accounts between Matthew and Singer, petitioner received a check from Singer for $17,692.51. By letter dated February 27, 1963, petitioner advised Singer; "On December 17, 1962 the undersigned (petitioner) remitted the sum of $8,500 on your behalf to Mr. Matthew to satisfy the Werner matter and the remaining credit to your account in the amount of $9,201.91 to be applied to the satisfaction of your $10,000 bank indebtedness. Therefore you owe the sum of $808.09 payable to the undersigned's trust account in order to resolve the whole matter." In January of 1964 petitioner remitted by check to BWC the amount of $9,201.91. The check voucher contained a notation indicating that $9,192.51 of the total amount represented a retained escrow balance "Re: M. Singer (Trust Acc.) (Singer-Matthew)." The remaining $9.40 was indicated as "office expense." While petitioner did hold the balance of the account in escrow for more than a year, we find no evidence that petitioner benefited personally *226 in this transaction or that there was any intent on the part of petitioner to evade tax on any amount. 4. Hiway House - Loan ($10,720) and Furniture ($25,951.11). Sometime during the years in issue petitioner developed a business relationship with a company known as Highway House Hotels (Hiway House) in Florida. Petitioner knew Sam Fishbein, president and principal owner of Hiway House, and Sol Tropp, the purchasing agent of the company. In addition to his work for Hiway House, petitioner pursued other business ventures with Fishbein and Tropp. In the spring of 1963 petitioner, having recently moved from California back to Miami, was in need of furniture for an apartment. Hiway House maintained a commercial account with Maxwell Company, a wholesale seller of furniture. Fishbein, as an accommodation to petitioner, arranged for him to purchase furniture from Maxwell through the account of Hiway House at wholesale prices. Maxwell insisted that the billing be through Hiway House. Petitioner purchased a total of $25,951.11 of furniture under this arrangement but the sales contract was between Maxwell and Hiway House. The ledger card for this account was designated Hiway House *227 "(Malnik)." This special account was credited with a down payment of $10,710 represented by a check from Fishbein to Maxwell in March, 1963. The balance of $16,803.52 was designated "time balance" and was payable, along with finance charges, over a two year period in installments. The installments were originally paid through Hiway House but when Hiway House became delinquent Maxwell sold the contract to American Acceptance Corporation. Petitioner subsequently entered into a contract with Acceptance to pay the balance in installments, which he did. Petitioner paid the entire cost of the furniture except for the down payment. In March 1963 petitioner, Fishbein and Tropp jointly obtained a loan of $50,000 from Ahmanson Bank. Although petitioner was obligated for one-third of the loan he only received $10,000. Fishbein retained the balance of petitioner's loan, $6,667.00, as a partial reimbursement of the $10,710 down payment he made on petitioner's furniture. In December 1964 petitioner paid Fishbein $4,000 in cash to settle his obligation to Fishbein for the down payment. Respondent determined that petitioner received $25,951.11 in 1963 from the transactions related to petitioner's *228 acquisition of the furniture from Maxwell as payment for legal services to Hiway House. In this proceeding and the criminal trial there was extensive testimony about this transaction. The testimony of Fishbein, Tropp and Greenfield, president of Maxwell at the time, all support petitioner's version of the transaction.The arrangements were not clear cut but Greenfield acknowledged that similar arrangements were frequently made to permit an individual to buy furniture at wholesale. Confusion was added in this transaction because Maxwell sold petitioner's contract to Acceptance and Fishbein left the company when Hiway House got into financial problems. Also $2,100.42 of a discount or commission Tropp was entitled to receive was applied to reduce the amount due. However, there was competent evidence of petitioner's direct payments on the furniture account and of petitioner's repayment of the down payment to Fishbein. All of the pieces of the puzzle may not be in place but the missing pieces, if any, do not prove fraud. 5. J. Weiss - $28,560.59. During 1963 petitioner sold common stock of the L.F. Popell Company on behalf of his friend and business associate, J. Weiss. Petitioner *229 set up an escrow account in Weiss' name, into which he deposited the proceeds of the various sales of Poppell stock owned by Weiss.Petitioner and Weiss communicated frequently regarding these transactions and petitioner kept Weiss informed of the terms of the various sales and the balance in the escrow account. Weiss paid no fee to petitioner in connection with these transactions but he did refer other business to petitioner. Petitioner offered into evidence a T-account prepared by his accountant, Raskin, reflecting various receipts and disbursements with respect to this escrow account. The T-account shows receipts of $127,807.21 and disbursements of $118,079.05 during 1963, leaving a balance in escrow of $9,728.16.The T-account shows that in April 1965, the escrow account was closed out by a disbursement to Weiss of $10,607.75. Respondent contends that petitioner received $115,210.59 from the stock sales and disbursed $107,650.00, leaving a balance of $6,060.59. Respondent now concedes that the adjustment in the notice of deficiency for 1963 should be reduced from $28,560.59 to $6,060.59. An explanation of the component figures used in respondent's and petitioner's calculation *230 reveal many similar amounts but it is not possible on this record to reconstruct these transactions with precision. Weiss testified unequivocably that he received every penny of the proceeds of the stock sales, as did petitioner. Weiss was in a position to check the receipt and disposition of funds in this escrow account and it was in his interest to do so. We rely primarily on the testimony of Weiss in concluding that petitioner did not receive taxable income from these transactions. We realize that in transactions such as this and in others that were not closed out until after 1963 that petitioner had time after the criminal investigation was started "to get his ducks in a row." To counter this, we assume, respondent has dealt with many of petitioner's escrow transactions as having been personal to petitioner and has charged him with income from any funds he had in his possession at the end of an accounting year on the theory that petitioner had no intention at that time to account to his clients for any balances. Although in some of the transactions there was a considerable time lag between the time petitioner received funds and disbursed them, there is no evidence to support *231 respondent's theory that he did not intend to disburse the funds. This is mere speculation on the part of respondent and such speculation cannot substitute for proof of fraud. C. Unidentified Bank Deposits
Respondent determined that petitioner received income in 1963 in the amount of $30,351.97 from various bank deposits which respondent contends have not been adequately identified by petitioner as nontaxable items. At trial, petitioner testified about most of the deposits in question and identified these items as deposits of his own funds and deposits in escrow for his clients. Petitioner's recollection of the identity of these items was refreshed by reference to documentary evidence such as Raskin's cash receipts worksheets and T-accounts, copies of bank account ledgers and deposit slips. Some of the bank statements and deposit slips contain notations by petitioner identifying the nature of the deposits. Respondent contends we should afford no credibility to petitioner's testimony with respect to these items; and that only original books and records would constitute competent and probative evidence for this purpose. As we explained in connection with the adjustments *232 for unidentified bank deposits in 1962, we are unable to accept respondent's categorical dismissal of the evidence offered by petitioner to establish the nature of these deposits. Respondent persistently argues throughout his brief that petitioner's failure to produce original books and records renders the evidence offered incompetent. We reiterate that what we are concerned with here is proof of fraudulent intent -- and respondent bears the burden of proof on that issue. Without petitioner's evidence we would have proof of nothing except that a deposit was made in petitioner's bank account some 20 years ago. We could not accept that bare fact alone as clear and convincing evidence that the deposit represented taxable income to petitioner which he knowingly and intentionally failed to report on his tax return with the intent to evade tax. Neither can we accept respondent's obvious and well understood frustration over not having access to petitioner's books and records, if any he had at the time of this trial, to check out petitioner's testimony as proof of fraud. That battle was tried and lost by respondent in the courts in United States v. Malnik,489 F.2d 682 (5th Cir. 1974). *233 III. INTEREST INCOME AND BUSINESS EXPENSES
In the notice of deficiency respondent determined that petitioner had failed to report interest income in relatively small amounts and had claimed some business expenses as deductions that were not allowable. Very little evidence was offered on these items and respondent does not rely on them independently for proof of fraud -- so we will not discuss them here. We have examined this sizable record with considerable care with reference not only to the items we have discussed herein but also with respect to a good many items that were included in the notice of deficiency, the pleadings, and the evidence offered at the trial but which we have not discussed specifically in this opinion. Our purpose was to discover whether, in our opinion, any of them, either independently or in conjunction with other items, would carry respondent's burden of proving by clear and convincing evidence that petitioner filed false or fraudulent returns for either 1962 or 1963 with intent to evade tax. Our conclusion was that they did not. SUMMARY AND CONCLUSION Malnik, primarily due to his association with Matthew in 1961 and the first part of 1962, *234 met and did legal and financial work for a number of people who were investors in various ventures. In the course of this business a lot of money passed through his accounts which did not represent taxable income to him. For example, he arranged loans for lenders who sent the money to Malnik and he then disbursed it to the borrowers. The reverse occurred when the borrowers repaid the loans. Malnik also arranged loans for borrowers and the borrowed funds often passed through his hands. He often used escrow accounts for this purpose but at times the funds passed through his business bank accounts. He also used escrow accounts in connection with his legal practice to hold funds he had received on behalf of others. He also bought and sold stocks and securities for and in behalf of clients and friends and the proceeds often passed through his bank accounts. When Malnik had a falling out with Matthew late in 1962 Malnik took on the task of trying to salvage the investments of some of the investors in BWC. This type of activity resulted in numerous deposits in Malnik's bank accounts that did not represent income to Malnik but which were difficult to distinguish from deposits that *235 did represent income to him, particularly with regard to someone like Malnik who kept no formal set of books and accounts. Petitioner did not cooperate with respondent's agents in trying to identify the transactions before the trials, but he did testify at both the criminal trial and at this trial about almost every transaction that was in dispute. His explanations for the most part, were credible and consistent in the two trials. Respondent offered little to rebut petitioner's explanations. While a careful analysis of all the evidence might reveal some inconsistencies and gaps in petitioner's evidence we cannot ignore that evidence and accept respondent's claim that because there were numerous sizable deposits in petitioner's bank accounts, they all represented taxable income to petitioner which he failed to report on his tax returns with intent to evade tax. The evidence presented to this Court appears to be quite similar to the evidence presented in the criminal case. While we are not bound by the jury verdict and the court's decision in those cases, we are justified in giving them consideration in reaching our conclusion here on the fraud issue, and we have done so. *236 We conclude that respondent has failed to prove by clear and convincing evidence that petitioners' returns for 1962 and 1963 were false or fraudulent with intent to evade tax. Consequently, assessment and collection of taxes for those years are barred by the statute of limitations. Section 6501. Decision will be entered for petitioner.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue. Respondent has conceded its determination of the addition to tax under § 6653(b) with respect to petitioner Deborah C. Malnik.↩
2. The term T-account is derived from the appearance of these accounts on paper -- a T-shaped configuration with the identification of the account above the bar, credits posted on the right, and debits posted on the left.↩
3. Petitioner did provide documentation to the Department of Justice in order to show that certain items were properly treated on the 1962 and 1963 returns.↩
4. Petitioner and Raskin were unable to locate the original workpapers Raskin used in preparing the returns.↩
5. The record herein consists of nineteen stipulations of facts with attached exhibits, the transcripts of the trial herein and the criminal trials, the reproductions of worksheets and T-accounts prepared by Raskin, and other exhibits received in evidence at trial. Many of the exhibits stipulated herein were also received in evidence in the criminal trial.↩
6. Petitioner made several other arguments concerning his privilege against self-incrimination. The court's order was not specifically based on any one legal theory.↩
7. This adjustment resulted primarily from respondent's determination that petitioner realized a loss of $108,921 on the sale of shares of stock in Allied Empire. Petitioner reported a gain of $32,583 from the sale of Allied stock on his 1963 return. Respondent and petitioner disagree on the proper cost basis to petitioner of this stock.↩
8. The 1963 return was filed June 15, 1964.↩
9. See also Compton v. Commissioner,T.C. Memo. 1983-642; Stoller v. Commissioner,T.C. Memo. 1983-319↩. 10. See also Whitten v. Commissioner,T.C. Memo. 1980-245↩.
11. For the purposes of this discussion, an "underpayment" is equivalent to a "deficiency." See § 6653(c)(1).↩
12. Petitioner acknowledges that respondent is not collaterally estopped from proving fraud by virtue of petitioner's acquittal in the criminal trial. Helvering v. Mitchell,303 U.S. 391, 401 (1938); Neaderland v. Commissioner,424 F.2d 639 (2d Cir. 1970), affg. 52 T.C. 532↩.
13. See also Compton v. Commissioner,T.C. Memo. 1983-642↩.
14. Petitioner testified that he treated reimbursements of business expenses in this manner on a number of occasions in order to short cut paper work in arriving at the same net amount. The correct way to report such transactions is to include the reimbursement in income and deduct the expense paid. However, we do not find this practice to be an indication of fraud under the circumstances.↩
15. Petitioner appears to have used escrow accounts on numerous occasions to hold funds that he received in behalf of others.↩
16. Also see Glass v. Commissioner,T.C. Memo. 1978-206↩.
17. The derivation of the cost basis was not explained. If, as petitioner contends, he reported the 5,000 shares as income in 1962 at $1 per share, the remaining basis of $4,125 would be attributable to the additional 200 shares sold, which would give them a basis of about $20 per share, consistent with respondent's value of $20 per share as of August 30, 1962.↩
18. We realize that this is inconsistent with petitioner's testimony that he included the stock at $1 per share in the legal fee income he reported for 1962. We have no breakdown of the legal fee income reported by petitioner on his 1962 return.↩
19. See prior discussion of BWC.↩
20. $918.75 was deducted by Trade Bank for expenses and fees. Disposition of the remaining $1,581.25 was not explained; presumably it was retained by BWC. There is no evidence that petitioner received any of the loan proceeds.↩
21. The figure was $50,000 in the notice of deficiency.↩
22. The notice of deficiency erroneously stated the amount of this item to be $300,000.↩
23. The figure was $205,308.80 in the notice of deficiency but respondent has conceded that $7,500 was attributable to a disbursement to Edward Levenson.↩